COURT OF APPEALS OF VIRGINIA

Present: Judges Kelsey,[*] Alston and Senior Judge Bumgardner
Argued at Alexandria, Virginia

COURTNEY E. BLAKEY

                                               MEMORANDUM OPINION[**] BY
v.      Record No. 0837-14-4         JUDGE ROSSIE D. ALSTON, JR.
                                                 FEBRUARY 18, 2015

UNIVERISTY OF VIRGINIA HEALTH SYSTEM/
 COMMONWEALTH OF VIRGINIA

FROM THE VIRGINIA WORKERS' COMPENSATION COMMISSION

> Benjamin J. Trichilo (McCandlish Lillard, PC, on briefs), for
> appellant.
>
> Ryan D. Doherty, Assistant Attorney General (Mark R. Herring,
> Attorney General; Rhodes B. Ritenour, Deputy Attorney General;
> Peter R. Messitt, Senior Assistant Attorney General, on brief), for
> appellee.
>
> Amicus Curiae: The Virginia Trial Lawyers Association (Diane
> C.H. McNamara, on brief), for appellant.

Courtney E. Blakey ("claimant") appeals a decision of the Workers' Compensation

Commission ("the commission") awarding her permanent partial disability benefits based on a

rating of a 43% loss of the use of her right upper extremity. On appeal in her five overlapping

assignments of error, claimant contends that the commission erred by unreasonably disregarding

the findings of claimant's treating physician and the impairment rating provided by a physician

who examined claimant and reviewed her medical history, while crediting an impairment rating

provided by a physician who never examined claimant. Further, claimant argues that the

---

[*] Justice Kelsey participated in the decision of this case prior to his investiture as a Justice of the Supreme Court of Virginia.

[**] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

commission erred by holding that disability ratings are limited by specific medical schedules or guides and by holding that pain is not an appropriate factor for consideration in the calculation of disability ratings. We agree with claimant that the commission erred by disregarding the overwhelming evidence from claimant's treating doctors and adopting an impairment rating unsupported by the evidence and provided by a physician who never examined claimant or her medical records. Therefore, on this very fact-specific case, we reverse the commission's decision and remand the case back to the commission for findings consistent with this opinion.

## I. Background[1]

On August 29, 2009, claimant, a licensed practical nurse ("LPN") employed as a nursing assistant for University of Virginia Health System ("employer"), sustained a work-related injury to her right arm when her arm was caught and jerked while she was holding a stretcher that collapsed with a patient on it. Claimant sought immediate medical attention and soon began treating with Dr. Eberly, a neurologist. Dr. Eberly issued his report on April 16, 2012, in which he stated that claimant had thoracic outlet syndrome. Electro Magnetic Imaging confirmed right ulner neuropathy. Dr. Eberly's findings noted that epidural steroid injections had proven ineffective, that after her injury claimant regularly dropped objects with her right upper extremity, and that she experienced paresthesias, dysthesias, and pain in the C7/T1 distributional along the medial aspect of her right arm and forearm.

On June 27, 2012, Dr. Phillips, an orthopaedic specialist, evaluated claimant and prepared a report. Dr. Phillips' report stated that claimant had reached maximum medical improvement and that in his opinion, claimant had a 72% permanent partial disability rating of

_____

[1] As the parties are fully conversant with the record in this case and because this memorandum opinion carries no precedential value, this opinion recites only those facts and incidents of the proceedings as are necessary to the parties' understanding of the disposition of this appeal.

the right upper extremity.  Specifically, Dr. Phillips calculated claimant's impairment rating based on the Fifth Edition of the AMA Guides to the Evaluation of Permanent Impairment, which factored in impairment ratings for flexion, abduction, adduction, and internal and external rotation of the upper extremity, as well as strength loss and sensory deficits of the hand "which is caused by, and a direct result of, the thoracic outlet syndrome which is basically an injury to the nerves going to the upper extremity and affecting the region of the innervate, i.e., in particular the examinee's hand . . . ."  Finally, Dr. Phillips factored in an additional 8% permanent partial impairment each for the upper extremity and the hand "for pain, weakness, loss of function and loss of endurance[.]"

On September 4, 2012, Dr. Eberly confirmed with Managed Care Innovations, L.L.C., employer's claims' administrator, that he agreed with Dr. Phillips' 72% impairment rating of claimant's right arm, stating that "I agree with [Dr. Phillips'] rating, she is unable to work because of the injury."

At some point, apparently dissatisfied with the findings of Dr. Phillips, employer requested that a specific health care provider, Dr. Thomas Scioscia, a medical director with Managed Care Innovations, L.L.C., opine on whether he agreed with Dr. Phillips' and Dr. Eberly's disability rating of 72%.  The form employer submitted to Managed Care Innovations requesting Dr. Scioscia's opinion listed the phone numbers of claimant's treating physicians, Dr. Phillips and Dr. Eberly, and provided a three-paragraph summary of claimant's treatment.  In response, under the "Medical Director's Review and Findings Section," Dr. Scioscia without more, simply stated "Please see G2 chart.  A max rating of 43% for [upper extremity impairment] is reasonable, suggest IME or rating using 6th Edition of 'The Guides.'" Dr. Scioscia never examined claimant, reviewed her medical records or indicated that he contacted claimant's treating physicians.

Claimant filed her application for permanent partial disability benefits on July 16, 2012.[2] Employer opposed the claim, arguing that claimant had not reached maximum medical improvement and that Dr. Phillips' rating was "defective" due to his alleged "double counting" (for pain, loss of function, and loss of endurance, which employer contended was already factored into the AMA Guides rating calculations). At the hearing before the deputy commissioner on December 5, 2012, claimant testified that she drops things because her "grasp is off," her right extremity is cold, and she feels pain, "pin prickling," and a "stabbing, jolting type of feeling" through her body if someone touches her right upper extremity. During the day, claimant has constant numbness and pain at a level of 7 out of 10. The evidence also indicated that claimant's mother moved in to assist her in 2009 due to concerns over the pain claimant was experiencing and the side effects of medication she took.

With respect to her post-injury employment, claimant testified that Dr. Eberly released her to perform light-duty work on a trial basis in May 2012, and that she followed his instructions and obtained a part-time job as a licensed nurse practitioner two days every other weekend. Claimant also works two days a month as a secretary at a children's hospital in D.C. The job does not require claimant to do any lifting; she pushes a medication cart with her left hand and has CNAs assist her with applying treatment to patients.

Critical to performing her functions as a LPN, claimant stated that her injury has limited her in her job duties and personally because she cannot carry heavy things or pick up her son. Additionally, she had to go back to school to get her R.N. because of her physical limitations. LPNs are generally required to be able to lift over 25 pounds, which claimant could do before her injury.

---

[2]Claimant previously filed her first claim for benefits on January 25, 2010, alleging injury to her right shoulder, neck, and wrist and was awarded various periods of temporary total and partial disability benefits.

The deputy commissioner issued his opinion on December 19, 2012, awarding claimant benefits based on a disability rating of 43% to the right upper extremity. The deputy commissioner essentially discounted Dr. Eberly's validation and endorsement of Dr. Phillips' 72% impairment rating, concluding that "[t]here is no indication Dr. Eberly provided his own quantitative assessment to affirm the 72 percent impairment rating." The deputy commissioner also discounted Dr. Phillips' 72% rating because he added an additional 8% impairment for "pain, weakness, loss of function and loss of endurance . . . ." The deputy commissioner noted "[t]hat is not allowed." Finally, the deputy commissioner rejected Dr. Phillips' rating because he used "erroneous Virginia standards" based on tables in the AMA Guides the deputy commissioner determined Dr. Phillips misapplied.

On April 3, 2014, the commission issued its opinion affirming the deputy commissioner's ruling. Like the deputy commissioner, the commission questioned Dr. Phillips' findings because he increased claimant's disability rating by considering pain, weakness, loss of function, and loss of endurance. Additionally, the commission disapproved of Dr. Eberly's note to employer agreeing with Dr. Phillips' 72% rating because "the only basis expressed by Dr. Eberly for his agreement with Dr. Phillips' rating was that the claimant had been unable to work as a result of the injury" despite the fact that claimant had been working part time for about 19 months. Therefore, the commission found that "[t]here is nothing in the record to indicate that Dr. Eberly's agreement with Dr. Phillips' rating represented anything more than simply deferring to Dr. Phillips on the issue. Accordingly, we grant little evidentiary value to Dr. Eberly's opinion[.]"

Of significance is that the commission noted that Dr. Phillips' evaluation did contain data regarding the functionality of both body parts and that the medical history taken by him was "complete and consistent with the other evidence in the record." Remarkably, the commission

found that it was proper for the deputy commissioner to consider Dr. Phillips' opinion along with employer's medical evidence, to determine claimant's impairment rating. However to this end, the commission found that the data in Dr. Phillips' evaluation was "sufficient to allow Dr. Thomas Scioscia . . . to calculate a permanent impairment rating of 43 percent." The commission noted that the deputy commissioner was not required to discount Dr. Scioscia's rating because he did not personally examine claimant and that "[i]n light of Dr. Phillips' problematic calculation of the claimant's level of impairment, the [d]eputy [c]omission[er] was free to find the 43 percent disability rating assigned by Dr. Scioscia to be more credible than that offered by Dr. Phillips." Therefore, the commission affirmed the deputy commissioner's award based on a 43% impairment rating of claimant's upper right extremity. This appeal followed.

## II. Analysis

The fundamental purpose of the Workers' Compensation Act (the "Act") is to compensate employees for injuries "arising out of and in the course of employment . . . without regard to fault." Lawrence J. Pascal, Virginia Workers' Compensation: Law & Practice § 1.03 (4th ed. 2011). "It is as essential to industry as it is to labor." Id. (quoting Feitig v. Chalkley, 185 Va. 96, 38 S.E.2d 73 (1946)). "'Under well recognized principles governing the standard of review on appeal, we must affirm the commission's judgment awarding [permanent partial disability] if those findings are supported by credible evidence in the record, regardless of whether contrary evidence exists or contrary inferences may be drawn.'" United Airlines, Inc. v. Sabol, 47 Va. App. 495, 500, 624 S.E.2d 692, 694 (2006) (quoting Rusty's Welding Service, Inc. v. Gibson, 29 Va. App. 119, 131, 510 S.E.2d 255, 261 (1999)). "'In determining whether credible evidence exists, the appellate court does not retry the facts, reweigh the preponderance of the evidence, or make its own determination of the credibility of the witnesses.'" Id. at 501, 624 S.E.2d at 694 (quoting Pruden v. Plasser American Corp., 45 Va. App. 566, 574-75, 612

S.E.2d 738, 742 (2005)). "If the Commission's findings of fact are not based on credible evidence, 'its findings are not binding and the question presented becomes one of law.'" Ford Motor Co. v. Favinger, 275 Va. 83, 88, 654 S.E.2d 575, 578 (2008) (quoting Great Atlantic & Pacific Tea Co. v. Robertson, 218 Va. 1051, 1053, 243 S.E.2d 234, 235 (1978)).

"[T]o obtain benefits under Code § 65.2-503 for the loss of use of a particular body member, the claimant must establish that he has achieved maximum medical improvement and that his functional loss of capacity be quantified or rated." Cafaro Constr. Co. v. Strother, 15 Va. App. 656, 661, 426 S.E.2d 489, 492 (1993) (citing Hungerford Mechanical Corp. v. Hobson, 11 Va. App. 675, 401 S.E.2d 213 (1991)). "The commission, in determining permanent partial disability benefits, must rate claimant's percentage of incapacity based on the evidence presented to it. In doing so, it gives great weight to the treating physician's opinion." Sabol, 47 Va. App. at 501, 624 S.E.2d at 695 (citations omitted). Though not binding on this Court, we agree with the commission's acknowledgement and stated policy that

> In determining the extent of permanent loss of use of a member, the Commission has followed precedent and stated as policy that is it [sic] not held to anatomical loss determinations by one or more physicians nor is it limited by specific loss schedules or by various published guides which determine incapacity on the basis of a percent of motion or function of a member. Rather, the Commission may consider the nature of disability, the circumstances under which a member's use would be permanently affected, alternate use of a member in other employments for which the claimant may be qualified, the effect of pain on use capacity, and such pertinent considerations as would permit the Commission to make a reasonable determination of permanent loss or loss of use in each case.

Rivera v. Ford Motor Co., VWC File No. 216-39-16 (Va. Workers' Comp. Comm'n July 12, 2006) (citations omitted).

Acknowledging the legal standards controlling our consideration of the factual underpinnings of this matter, we hold that in the unique circumstances presented herein, because

- 7 -

the commission's findings of fact are not based on credible evidence, the commission's findings are not binding on this Court and the question presented before us thus becomes one of law. Because the commission's award of a 43% rating was based solely and simply on Dr. Scioscia's note, which under these very particularized facts falls far short of being credible evidence, the commission erred in awarding benefits based on a 43% impairment rating.  See Favinger, 275 Va. at 88, 654 S.E.2d at 578 ("If the [c]ommission's findings of fact are not based on credible evidence, 'its findings are not binding and the question presented becomes one of law.'" (quoting Great Atlantic & Pacific Tea Co., 218 Va. at 1053, 243 S.E.2d at 235)).  Though great deference is merited and indeed given to the commission in weighing and determining the credibility of the evidence, in this case, Dr. Scioscia's 43% "rating" was simply not sufficient to merit the great deference traditionally warranted.

To begin with, Dr. Scioscia never examined the claimant or reviewed her medical records.  In fact, the only information related to claimant's injury given to Dr. Scioscia was a two-paragraph summary of treatment, presumably completed by someone at Managed Care Innovations, L.L.C., and Dr. Phillips' report.  Additionally, Dr. Scioscia's note does not reflect that he ever contacted either of claimant's treating physicians or reviewed their records.  Further and most importantly, Dr. Scioscia's note *did not provide an actual impairment rating for claimant's right upper extremity*.  His note specifically stated that a "max rating of 43% for the UEI is reasonable" but he goes on to recommend an IME "or rating using 6th Edition of 'The Guides.'"  Indeed under these facts, Dr. Scioscia was virtually incapable of calculating an impairment rating himself because he had wholly insufficient information from which to calculate an impairment rating.  Rather, he merely opined that he thought Dr. Phillips' rating was higher than reasonable, that the concurring endorsement of that finding was not tenable, and that employer should consider having claimant undergo an IME with a doctor who could then

- 8 -

calculate an impairment rating using the Sixth Edition of the AMA Guides. Dr. Scioscia's note was not a report; it was not based on any level of sufficient knowledge of claimant's injury, had no basis in fact, and did not provide a rating to any degree of medical certainty. Therefore, it was wholly insufficient evidence on which to base an award.

There is no dispute with the general analytical framework professed by the dissent. With all due respect, the dissent spends much of its analysis discrediting Dr. Eberly's and Dr. Phillips' opinions and in its efforts to do so, acknowledges the principles that when an expert's rating "flows from an assumption that rests upon a faulty premise, . . . the commission may refuse, and often will be required to refuse, to attribute any weight to that opinion." Sneed v. Morengo, Inc., 19 Va. App. 199, 205, 450 S.E.2d 167, 171 (1994) (citing Clinchfield Coal Co. v. Bowman, 229 Va. 249, 252, 329 S.E.2d 15, 16 (1985)). And, even though "a treating physician's opinion normally is given great weight, such an opinion is not conclusive, *especially when the opinion is not accompanied by any reasoning or explanation*." Thompson v. Brenco, Inc., 38 Va. App. 617, 623, 567 S.E.2d 580, 583 (2002) (emphasis added). The distinct problem in the instant matter is that Dr. Scioscia's note rests upon *no premise whatsoever* as he did not provide an actual rating and did not provide any opinion of claimant's disability to any degree of medical certainty. Dr. Scioscia's note, even if it could be called an impairment rating, was merely based on Dr. Scioscia's review of employer's brief summary of claimant's injuries as he neither reviewed any medical records nor spoke to claimant's treating physician. The commission may take issue with Dr. Phillips' methodology or the perceived brevity of Dr. Eberly's concurrence with Dr. Phillips' opinion, however it cannot ignore that both were based on full reviews of medical records and examinations of claimant whereas Dr. Scioscia did not provide a disability rating and his "opinion" that a maximum 43% rating would be "reasonable" was "not accompanied by any reasoning or explanation." Id. "'A medical opinion based upon a

- 9 -

'possibility' is irrelevant, purely speculative and hence, inadmissible.'" <u>Farmington Country Club, Inc. v. Marshall</u>, 47 Va. App. 15, 28, 622 S.E.2d 233, 240 (2005) (quoting <u>Spruill v. Commonwealth</u>, 221 Va. 475, 479, 271 S.E.2d 419, 421 (1980)). Dr. Scioscia's conclusory note, unlike Dr. Phillips' full report and Dr. Eberly's assessment and concurring opinion, merely speculated that an independent medical exam and rating based on the Sixth Edition to the AMA Guides would yield a maximum reasonable disability rating of 43%. He did not calculate that rating himself or base it on anything other than a two-paragraph summary of claimant's injuries provided by employer. Therefore, Dr. Scioscia's note was not *credible* evidence upon which an award should have been based.

Absent Dr. Scioscia's note, the only evidence before the commission supported a 72% impairment rating – Dr. Phillips' impairment rating and a concurrence from claimant's treating physician, Dr. Eberly. The commission partially discredited the value of Dr. Phillips' rating because he factored in additional impairment for "pain, weakness, loss of use in addition to impairment" and because he based his impairment rating on an alleged misinterpretation of tables in the Fifth Edition of the AMA Guides. This was also error. Neither a physician nor the commission is limited to specific guides or tables when determining an impairment rating. <u>See</u> <u>Rivera</u>, VWC File No. 216-39-16 (Va. Workers' Comp. Comm'n July 12, 2006). Further, pain while not compensable, is *ratable*. While "pain alone is not compensable[,] . . . common sense, logic, and medical opinion dictate that pain can, at times, impair function and result in disability." <u>Lynchburg Foundry Co. v. Tucker</u>, No. 2251-91-3 (Va. Ct. App. Sept. 29, 1992) (per curiam).[3]

---

[3] "Although not binding precedent, unpublished opinions can be cited and considered for their persuasive value." <u>Otey v. Commonwealth</u>, 61 Va. App. 346, 350 n.3, 735 S.E.2d 255, 257 n.3 (2012) (citing Rule 5A:1(f)).

Dr. Phillips based his rating on consultation with recognized medical guides as well as his assessment of other factors affecting claimant's continued, legitimate, and severe disability, such as pain, loss of use, and endurance. To that end, it is important to note that there was no dispute in this case over whether claimant suffered an injury, the severity of that injury, the appropriateness of the jobs she currently works, nor were there any allegations of malingering. In fact, despite Dr. Scioscia's recommendation, employer never requested an independent medical exam or impairment rating of claimant. Given the evidence supporting Dr. Phillips' impairment rating, we hold that it was error for the commission to discredit Dr. Phillips' rating for the reasons that it did.

Moreover, the commission erred by discrediting Dr. Eberly's opinion on Dr. Phillips' impairment rating because "the only basis expressed by Dr. Eberly for his agreement with Dr. Phillips' rating was that the claimant had been unable to work as a result of the injury." To the contrary, the record showed that claimant had been working part time for about 19 months, pursuant to instructions from Dr. Eberly. In addition, Dr. Eberly had been claimant's treating physician since 2009. He approved her release to light-duty work on a trial basis as of May 2012. Travelling miles to different work opportunities and oftentimes living in hotels, claimant was only working six days a month at the time of the hearing. The history relied upon by Dr. Phillips in determining his impairment rating included Dr. Eberly's records. Certainly Dr. Eberly's status as claimant's treating physician and familiarity with the history of her injury and return to work rendered him well-equipped to opine on an impairment rating for her arm. See Sabol, 47 Va. App. at 501, 624 S.E.2d at 695 (noting that in rating claimant's percentage of incapacity based on the evidence presented to the commission, the commission "gives great weight to the treating physician's opinion"). Standing in contrast to Dr. Scioscia's conclusory remark bereft of any factual findings, Dr. Eberly objectively stated that he agreed with

- 11 -

Dr. Phillips' impairment rating and agreed that claimant could not work. Even once released to light-duty work, claimant's two positions combined only amounted to six days a month employment. Given Dr. Eberly's history and familiarity with claimant and her injury, and the fact that he was only asked to opine on the impairment rating and not calculate or provide a basis for his own, there was no reason for the commission to arbitrarily discredit Dr. Eberly's opinion.

For these reasons we hold that there was no credible evidence in the record to support the commission's award of benefits based on a 43% impairment rating of claimant's upper extremity and remand this case to the commission for disposition consistent with this opinion.

<u>Reversed and remanded.</u>

Kelsey, J., dissenting.

In this case, the claimant's counsel hired an expert witness to give a medical opinion on the extent of the claimant's disability. After seeing the claimant one time and after expressly disclaiming any physician-patient relationship, the hired expert concluded that the claimant should be given a 72% permanent partial disability (PPD) rating. That conclusion was then presented to the claimant's treating physician in a form letter. The treating physician scrawled on the form that he agreed with the PPD rating.

No evidence suggested that the treating physician read the hired expert's report. Nor does the record suggest that the treating physician performed any independent analysis of the many variables that go into calculating a disability rating (or, for that matter, that he even knew the correct name of the expert). To make matters worse, the treating physician adopted the hired expert's PPD rating, based on the mistaken assertion that the claimant was unable to work because of the accident even though, in fact, she had been working in a limited capacity for over a year.

The claimant argues on appeal that the law compels the commission, sitting as factfinder, to accept her hired expert's "uncontested" opinion. See, e.g., Appellant's Br. at 14, 16; Oral Argument Audio at 07:20 to 07:26. I disagree. Under settled principles, the claimant had the burden of proof to establish by a preponderance of the evidence the extent, if any, that she was disabled as a result of her accident. The evidence she presented was arguably sufficient, though barely so, for the commission to accept the expert's 72% PPD rating. Sitting as factfinder, however, the commission was understandably not persuaded. The commission found serious flaws in the hired expert's analysis and determined that the treating physician hurriedly deferred to this flawed analysis without any independent analysis.

It is thus an overstatement, at best, for the claimant to assert that no rational factfinder could be unpersuaded by the hired expert's PPD rating. Aware of this, the claimant does what many litigants do when faced with an apparently insurmountable hurdle — she changes the subject from the only relevant issue to a wholly irrelevant one by challenging the evidentiary basis for the commission's decision to award her the lower 43% PPD rating. This contention is emotively appealing but conceptually flawed because, if it were true, she would get nothing.

The question in this case is not whether the lesser award should be vacated as factually insupportable (a remedy the employer does not seek on appeal) but whether the commission could rationally find that the preponderance of the evidence did not support the higher award. By incorrectly framing the debate in this manner, the claimant has given an arguably correct answer to an indisputably wrong question. It is irrelevant whether "the commission erred in awarding benefits based on a 43% impairment rating." *Supra* at 8. The only issue we must decide is whether the commission erred in rejecting as factually unpersuasive the 72% PPD rating advocated by the claimant's hired expert. For the following reasons, I believe the commission did not err in doing so.

## I.
### A. APPELLATE STANDARD OF REVIEW

On appeal, we review *de novo* the commission's legal conclusions. "In contrast, we review questions of fact under the highest level of appellate deference." Thorpe v. Clary, 57 Va. App. 617, 623, 704 S.E.2d 611, 614 (2011), aff'd sub nom. Thorpe v. Ted Bowling Constr., 283 Va. 808, 724 S.E.2d 728 (2012). "By statute, we treat the commission's factfinding as 'conclusive and binding' if it rests on a sufficient threshold of evidence." Id. (quoting Berglund Chevrolet, Inc. v. Landrum, 43 Va. App. 742, 749-50, 601 S.E.2d 693, 697 (2004)). "This

appellate deference is not a mere legal custom, subject to a flexible application, but a statutory command that binds us so long as a rational mind upon consideration of all the circumstances could come to the conclusion the commission adopted." Id. (citation and internal quotation marks omitted).

"Because we do not judge the credibility of witnesses or weigh the evidence on appeal, our personal view of the underlying factual debate plays no role in the task of appellate review." Id. (quoting Clifton v. Clifton Cable Contracting, LLC, 54 Va. App. 532, 541 n.2, 680 S.E.2d 348, 353 n.2 (2009)). "It thus makes no difference that we would have decided the facts differently, because the statute authorizes the commission to adopt whatever view of the evidence it considers most consistent with reason and justice." Id. at 623-24, 704 S.E.2d at 614 (citations, brackets, and internal quotation marks omitted).

### B.   THE PERMANENT DISABILITY FACTUAL FINDING

The claimant bore "the burden of proving [her] disability and the periods of that disability." Donovan v. United Parcel Service, Inc., 63 Va. App. 438, 445, 758 S.E.2d 99, 102 (2014) (quoting Marshall Erdman & Assocs. v. Loehr, 24 Va. App. 670, 679, 485 S.E.2d 145, 149-50 (1997)). Attempting to shoulder that burden, the claimant's counsel hired Dr. Jeffrey Phillips, an orthopedist, to provide a written expert opinion concerning the extent of the claimant's disability. App. at 107-09, 226-28. Dr. Phillips saw the claimant on one occasion for this purpose and clearly documented that "no doctor/patient relationship was established" between them. Id. at 107. He opined that the claimant suffered a 72% PPD rating affecting her upper right extremity. Dr. Phillips based this opinion on his interpretation of various provisions of the Fifth Edition of the AMA Guides to the Evaluation of Permanent Impairment ("AMA Guides").

- 15 -

The claimant's treating physician, Dr. Lewis Eberly, was later given a form letter advising him that "Dr. Phillip Green" had provided an expert report opining a 72% PPD rating. Id. at 104, 231. The form asked whether Dr. Eberly agreed with the rating and specifically asked, "Why or why not?" Id. In reply, Dr. Eberly made a two-sentence handwritten note on the form stating: "I agree with this rating. She is unable to work because of the injury." Id. Dr. Eberly was apparently unaware that "Dr. Phillip Green" did not exist (the report was issued by Dr. Jeffrey Phillips)[4] and indicated as the basis for his agreement that the claimant was unable to work when she had already returned to work in a limited capacity. Dr. Eberly also made no effort to explain whether he had independently calculated the 72% PPD rating and, if so, what combination of variables justified the rating.

The employer's claims administrator then asked Dr. Thomas Scioscia to review Dr. Phillips's independent medical evaluation (IME) report and offer an expert opinion on the disability rating that he had assigned. Dr. Scioscia reviewed Dr. Phillips's findings. Disagreeing with the 72% PPD rating opined by Dr. Phillips, Dr. Scioscia concluded that a "max rating of 43%" was reasonable. Id. at 233. He added that an IME or PPD rating should be based on the more up-to-date "6th Edition of 'The [AMA] Guides.'" Id.

The claimant filed a petition seeking a 72% PPD rating for her upper right extremity. The claimant did not call Dr. Phillips as a witness and instead relied solely on his written report. The deputy commissioner rejected the hired expert's opinion, reviewed the extensive written medical record, and found that the evidence supported only a 43% PPD rating. See id. at 245. Both the claimant and the employer requested review by the full commission. The claimant

_____

[4] The form mistakenly referred to Dr. Jeffrey Phillips, with the medical partnership of Phillips & Green, M.D., as "Dr. Phillip Green." See App. at 104, 231.

- 16 -

argued for a 72% PPD rating, as suggested by Dr. Phillips, while the employer contended that the medical evidence justified a 14% PPD rating, not the "max rating" of 43% suggested by Dr. Scioscia. Id. at 233.

On review, the full commission disagreed with both parties and agreed with the deputy commissioner. The commission's analysis began with Dr. Eberly, the only treating physician who had said anything about the claimant's PPD rating. The form request asked him if he agreed with the 72% PPD rating and, if so, to explain the basis for his opinion. The commission was struck by the fact that Dr. Eberly, while offering no explanation of any kind, simply jotted down a handwritten statement saying that he agreed with the rating. Dr. Eberly presented no independent analysis of either the claimant's disability or Dr. Phillips's application of the AMA Guides. Nothing in the record, the commission observed, suggested that Dr. Eberly had reviewed the "examination report" of Dr. Phillips or "that he performed any calculation or analysis in arriving at his opinion." Blakey v. Univ. of Va. Health Sys., 2014 Va. Wrk. Comp. LEXIS 100 (Apr. 3, 2014).

Furthermore, the commission noted, the "only basis expressed by Dr. Eberly" for agreeing with the 72% PPD rating "was that the claimant had been unable to work as a result of the injury." Id. But that premise was mistaken because the claimant "in fact had been working for approximately 19 months." Id. In sum, the commission concluded: "There is nothing in the record to indicate that Dr. Eberly's agreement with Dr. Phillips' rating represented anything more than simply deferring to Dr. Phillips on the issue. Accordingly, we grant little evidentiary value to Dr. Eberly's opinion . . . ." Id.

The commission also found fault with the disability rating methodology used by Dr. Phillips. He had added an "additional rating for pain, weakness, loss of function and loss of

endurance" based upon "Chapter 18 of the 5th edition of the AMA Guides." Id. (brackets

omitted). That chapter, however, specifically disclaims any attempt at measuring impairment

caused by pain and weakness. Id. (quoting AMA Guides to the Evaluation of Permanent

Impairment § 18.3b, p. 571 (5th ed. 2000)). When the commission consulted the correct portion

of the AMA Guides, it found that a "'formal pain-related impairment assessment'" should be

performed to measure accurately this component of the impairment rating. Id. (quoting AMA

Guides § 18.3d, p. 573). Dr. Phillips never performed this formal assessment.

Perplexed by these inconsistencies, the commission explained in detail why it discounted

the hired expert's opinion:

> [T]he AMA Guides instruct an examiner to include pain-related
> impairment, if found, in the overall impairment rating determined by
> the body or organ rating system. The examiner is not instructed, as
> Dr. Phillips did, to provide separate ratings for pain and loss of use in
> addition to impairment. Furthermore, Dr. Phillips did not explain
> why loss of function caused by pain could not be assessed through the
> body rating system provided in the AMA Guides, nor did he classify
> the claimant's pain-related impairment or indicate whether it was
> ratable or unratable. While pain that results in "permanent partial" or
> "permanent total loss" is compensable, the Act does not compensate
> for pain alone.
>
> Even if the claimant's pain caused some additional loss of use in this
> case, it is impossible to calculate the additional percentage to which
> she would be entitled. The reason for this is that Dr. Phillips gave the
> claimant an additional rating of eight percent impairment for the total
> of four different conditions, specifically pain, weakness, loss of
> function and loss of endurance, without indicating the percentage
> attributable to each of the four factors. Since Dr. Phillips did not
> break out from the eight percent the amount of loss of function, if any,
> caused by pain, versus the amount of the eight percent attributable to
> the other conditions, we have no basis for doing so. More
> problematic is Dr. Phillips' inclusion of loss of function in the
> additional eight percent, since the very purpose of the initial base
> impairment rating was to address the loss of function. Thus it would
> appear that any additional amount included in the eight percent for
> loss of function would be duplicative as it would be included in the

base rating. The burden was on the claimant to prove the extent of her impairment, and since Dr. Phillips did not indicate that the claimant's pain caused a loss of function, did not explain how his additional loss of function impairment was not duplicative, and did not break out how much the additional eight percent was attributable to each of the four factors he identified, the claimant has failed to prove entitlement to the additional eight percent or to any lesser additional amount.

Id. (citation omitted).

The deputy commissioner had also discounted the PPD rating offered by Dr. Phillips based on the commission's previous experience with him.[5] In Henderson v. Coffeewood Corr. Ctr., 2007 Va. Wrk. Comp. LEXIS 493 (Aug. 13, 2007), the commission rejected a rating Dr. Phillips had assigned to a different claimant because of similarly defective methodology. App. at 244. In that case, Dr. Phillips had "enhanced his rating by 6 percent, 'because of pain, loss of function, and loss of endurance,'" but, as the deputy commissioner noted, "[i]t is improper to separately rate these items. While pain and loss of function may be considered to the extent that they inhibit function, they are not separately rated." Henderson, 2007 Va. Wrk. Comp. LEXIS 493, at *14.

In addition, the commission distinguished between a physical "impairment" (as the medical community uses the term) and a statutory "disability" (as Code § 65.2-503(A) & (D) uses the term). Correctly applying this distinction, the commission explained:

---

[5] The commission adopted "as its own" the "Deputy Commissioner's summary of the evidence," id. at 273, as well as "the Deputy Commissioner's reasoning and analysis regarding the weight of the evidence in the record," id. at 278, which included extensive medical evidence. The deputy commissioner's summary of the evidence not only considered the testimony by the claimant, but the summary began with the words: "The claimant testified . . . ." Id. at 241. The summary thus not only considered the claimant's testimony but framed the injurious event and the claimant's subsequent impairment on the basis of her testimony. Id. This is contrary to assertions by the claimant on appeal that the commission failed to consider or outright disregarded testimony by the claimant and her mother. See, e.g., Appellant's Br. at 1, 2, 6, 14; see also Amicus Br. at 22, 23, 36.

The AMA Guides define impairment as "a loss, loss of use, or derangement of any body part, organ system or organ function." Id. at 2. Thus "impairment" as used in the AMA Guides is interchangeable with "loss" or "loss of use" as used in § 65.2-503. While the degree of impairment is to be considered in determining disability under the AMA Guides, the other factors relating to disability do not influence the impairment rating. "An impaired individual may or may not have a disability." Id. at 3, Table 1-1. It is "impairment" as defined by the AMA Guides which equates to the "loss" or "loss of the use" for which benefits are awarded under Va. Code § 65.2-503, not a claimant's "disability," "incapacity for work" or loss of wages. Compare AMA Guides, Section 1.2b, p. 8 with Va. Code § 65.2-503(A) & (D).

Since it is compensation for the loss or loss of use of a body part that is awarded pursuant to § 65.2-503, not the claimant's resulting inability to meet "personal, social, or occupational demands," the statute does not implicate the social and economic factors identified in the dissent and represented by the AMA Guides' definition for "disability". While a claimant may receive benefits for either total or partial incapacity for work caused by a compensable injury, such benefits are available under §§ 65.2-500 or 65.2-502 and not under § 65.2-503. "Benefits awarded under Code § 65.2-503 constitute indemnity for the loss of or loss of use of a scheduled body member. Such benefits are not awarded for loss of earning capacity, as are benefits provided for under Code § 65.2-500." Cross v. Newport News Shipbuilding & Dry Dock Co., 21 Va. App. 530, 535, 465 S.E.2d 598, 600 (1996) (citing Williams, 1 Va. App. at 404, 339 S.E.2d at 554)). See also LesCallett v. Rozansky & Kay Constr. Co., 23 Va. App. 404, 406, 477 S.E.2d 746, 747-48 (1996) ("Proof of the functional loss of the member, not industrial incapacity, is required for an award of benefits under Code § 65.2-503."). *Indeed, the claimant in the present case is receiving benefits under § 65.2-502 for loss of earning capacity, and has been receiving such benefits since February 22, 2011*.

Blakey, 2014 Va. Wrk. Comp. LEXIS 100 (emphasis added).

The factual basis underlying these findings cannot be dismissed as arbitrary or irrational. Whether we would have reached the same decision if we were the factfinder is inconsequential. We have neither the institutional authority nor the professional competence to second-guess the commission on fact-intensive judgment calls. It bears repeating: "A finding of fact made by the

Commission, based on evidence *deemed by it* to be credible, is conclusive and binding on us and in the absence of fraud is not subject to review." Williams v. Fuqua, 199 Va. 709, 713, 101 S.E.2d 562, 566 (1958) (emphasis added).

The only question we must ask is whether, applying "the highest level of appellate deference," we can justifiably disregard the statutory command to treat the commission's factfinding as "conclusive and binding." Thorpe, 57 Va. App. at 623, 704 S.E.2d at 614 (internal quotation marks omitted). Whatever that basis might be, it cannot simply rest on our view of the "credibility of witnesses" or the "weigh[t] [of] the evidence" because "our personal view of the underlying factual debate plays no role in the task of appellate review." Id. (internal quotation marks omitted).

The claimant acknowledges these principles but nonetheless points out, quite correctly, that we do not (and should not) defer to factfinders that predicate their findings on erroneous legal principles. In her multiple assignments of error, the claimant identifies two principles of law that the commission allegedly violated: First, a factfinder may attribute "great weight" to the medical opinions of a treating physician. *Supra* at 7; see also Appellant's Br. at 2-3. Second, the commission's PPD rating should not be a mechanical application of the AMA Guides. *Supra* at 1-2; see also Appellant's Br. at 3. Neither of these legal errors infects the commission's factfinding in this case.

With respect to the claimant's first point, it is true the commission could have attributed great weight to the treating physician's two-sentence, handwritten notation (even though based upon a mistaken assertion of unemployment) that stated he agreed with the hired expert's PPD rating. But the commission, sitting as factfinder, chose not to do so — something every Virginia

- 21 -

case mentioning the treating-physician preference acknowledges as appropriate.[6] It is easy to see why the commission came to this conclusion. When an expert's rating "flows from an assumption that rests upon a faulty premise, . . . the commission may refuse, and often will be required to refuse, to attribute any weight to that opinion." Sneed v. Morengo, Inc., 19 Va. App. 199, 205, 450 S.E.2d 167, 171 (1994) (citing Clinchfield Coal Co. v. Bowman, 229 Va. 249, 252, 329 S.E.2d 15, 16 (1985)). And, even though "a treating physician's opinion normally is given great weight, such an opinion is not conclusive, *especially when the opinion is not accompanied by any reasoning or explanation*." Thompson v. Brenco, Inc., 38 Va. App. 617, 623, 567 S.E.2d 580, 583 (2002) (emphasis added)). Both of these flaws damaged the credibility of the treating physician's opinion in this case.[7]

The cases cited by the claimant demonstrate how these principles work. Not one of them involves an appellate reversal of the commission's denial of benefits coupled with an order

---

[6] We have repeatedly emphasized that the treating-physician preference is not "necessarily conclusive," Berglund Chevrolet, 43 Va. App. at 753 n.4, 601 S.E.2d at 698 n.4, and is always "subject to the commission's consideration and weighing," H. J. Holz & Son v. Dumas-Thayer, 37 Va. App. 645, 655, 561 S.E.2d 6, 11 (2002) (quoting Hungerford Mech. Corp. v. Hobson, 11 Va. App. 675, 677, 401 S.E.2d 213, 215 (1991)). Accord 1 Arthur Larson & Lex K. Larson, Larson's Workers' Compensation Law § 130.05 (Matthew Bender, rev. ed. 2014) ("If the Commission chooses to believe one doctor whose opinion as to . . . the extent or duration of the claimant's disability is contradicted by that of another — or even of six or seven or ten others — the court has no power to reverse its determination. This is true even if the minority doctor bases his or her opinion on a theory that is not accepted as sound by the majority of the medical profession. Although this theory is novel, unpopular, or iconoclastic, the probative force of the testimony is for the trier of fact, and is reviewable only for manifest error.").

[7] "With all due respect," the majority contends, "the dissent spends much of its analysis discrediting Dr. Eberly's and Dr. Phillips' opinions . . . ." *Supra* at 9. Not so. It was the commission — the *factfinder* in this case — that discredited these opinions. I merely defer to the commission's factfinding on these issues and restate the factual record in the light most favorable to the employer, the party that prevailed before the commission. The governing standard of appellate review requires no less.

- 22 -

directing the commission to grant benefits — which could occur only in situations in which the treating physician's opinion was so irrefutable that no rational factfinder could find it unpersuasive.[8] The claimant instead relies only on cases in which the commission had granted benefits, and we or the Virginia Supreme Court rejected the employer's argument on appeal that the evidence from the treating physician failed to make a *prima facie* showing sufficient to support the award.

With respect to the claimant's second point, I agree that the commission cannot simply adopt the AMA Guides as a thoughtless substitute for the arduous task of weighing the evidence as a whole and coming to a reasoned decision on the permanent, partial disability rating. The commission, however, expressly acknowledged that it is not "limited by specific loss schedules or by the various published guides which determine incapacity," Blakey, 2014 Va. Wrk. Comp. LEXIS 100 (internal quotation marks omitted), or in any way required to base a PPD rating "on a formal guide such as the AMA Guides," id. (text in parenthetical to case citation).

To be sure, the only reason that the commission even addressed the AMA Guides is because the claimant's hired expert relied exclusively upon them. As the commission made clear:

---

[8] Factually sufficient findings (usually called a *prima facie* case) must be distinguished from legally incontestable findings (those an appellate court says that no rational factfinder could ignore). A *prima facie* case is the threshold level of evidentiary proof that is sufficient to permit a factfinder, if he is so persuaded, to grant the relief requested. Nothing in the concept of a *prima facie* case, however, requires that the factfinder actually be persuaded. In logical as well as legal terms, a *prima facie* case sets out a sufficient premise, but not a necessary one — that is, a plausible understanding of the evidence that the factfinder *can* accept, but not one that he *must* accept. See generally Cent. Va. Obstetrics & Gynecology Assocs. v. Whitfield, 42 Va. App. 264, 274-76, 590 S.E.2d 631, 637-38 (2004); Charles E. Friend & Kent Sinclair, The Law of Evidence in Virginia § 4-4, at 218 (7th ed. 2012); 9 John H. Wigmore, Evidence § 2494, at 378-80 (Chadbourne rev. 1981) (footnotes omitted).

- 23 -

> We agree that we are not bound by the AMA Guides in determining the degree of permanent impairment sustained by a claimant.  However, Dr. Phillips indicates in his report that he based his rating upon the AMA Guides.  Accordingly, in order to determine the weight to give to his rating, we must evaluate the rating in light of the AMA Guides.

Id.  For these reasons, the commission cannot be faulted for considering the AMA Guides in the context of this case.

II.

In sum, the claimant asks us to reweigh the medical record, to find by a preponderance of the evidence that her hired expert's opinion is legally incontrovertible, and to order the commission to make a permanent, partial disability award based upon the expert's 72% PPD rating.  I see no legal basis for granting any of these requests.

I thus respectfully dissent.